9

201001                              SPV/lp

United States Courts
Southern District of Texas
FILED

NOV 1 6 2001

Michael N. Milby, Clerk

## IN THE UNITED STATED DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HANSEN-MUELLER COMPANY | § | |
| Plaintiff | § | |
| | § | |
| -against- | § | |
| | § | |
| M/V SEA TRADER | § | C.A. No. B-01-137 |
| her engines, tackle, etc. | § | (In Admiralty) |
| | § | |
| -and against- | § | |
| | § | |
| SARNIA CORP. LTD. and | § | |
| CHORUS MARITIME INC. | § | |
| Defendants | § | |

## HANSEN-MUELLER COMPANY'S RULE 26 DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Hansen-Mueller Company (hereinafter "Hansen"), submits its initial disclosures.

### A. RESERVATION OF PRIVILEGES

The following Rule 26(a)(1) disclosures are submitted subject to and without waiving any right to protect any and all communications from disclosure pursuant to federal statute, rule, or law. These rights include, but are not limited to, attorney/client privilege, attorney work product privilege, investigative privilege, party communication privilege, and consulting expert privilege.

### B. INCORPORATION OF OTHER RULE 26 DISCLOSURES

"Hansen" incorporates all persons designated by all other parties as persons or entities which may have discoverable information relevant to disputed facts alleged with particularity in the pleadings of this case.

## C. PERSONS WITH KNOWLEDGE OF RELEVANT FACTS

The following persons or entities may have discoverable information relevant to the disputed

facts alleged with particularity in the pleadings of this case:

1.      Mr. Steve Sobota
        Director - Oats Merchandising
        Hansen-Mueller Company
        12231 Emmet Street, Suite 1
        Omaha, Nebraska 68164
        Telephone: (402) 491-3385

Mr. Sobota has knowledge of the commercial value of the shipment of oats, the transportation arrangements for the cargo, and the Plaintiff's damages.

2.      Mr. Michael Goodnight
        Marine Surveyor
        Capt. I.S. Derrick Independent and Cargo Surveyors, Inc.
        12711 Woodforest Professional Plaza
        Houston, Texas 77015
        Telephone: (713) 451-2711

Mr. Goodnight was the principal marine surveyor representing cargo interests at the time of the discharge of the oats in Brownsville, Texas. He has knowledge of the condition of the vessel and its cargo at the time of discharge. He also has knowledge of the commercial value of the cargo and the Plaintiff's damages. Mr. Goodnight also has opinions related to the cause of the water damage to the shipment of oats.

3.      Mr. Mical C. Renz
        Dixie Services Incorporated
        Post Office Box 451
        Galena Park, Texas 77547
        Telephone: (713) 672-1619

Mr. Renz has knowledge regarding the chemical analysis of cargo samples submitted to his laboratory for testing.

4.      Mr. Arvel Thorning
        The Russel Marine Group
        101 Woodland Highway
        Belle Chasse, Louisiana 70037
        Telephone: (504) 392-3900

Mr. Thorning was a port representative of the Plaintiff during the course of the discharge of the cargo.

     5.     Mr. Paul Estachy
             Vice President
             Southern Stevedoring Co., Inc.
             11821 East Freeway, Suite 310
             Houston, Texas 77029
             Telephone: (713) 453-3388

Mr. Estachy has knowledge regarding the Plaintiff's damages and more specifically regarding the increased costs of discharge operations due to the water damaged oats.

     6.     Mr. Craig Elkins
             Port Elevator - Brownsville, L.C.
             Port of Brownsville
             Brownsville, Texas 78521
             Telephone: (956) 831-8245

Mr. Elkins has knowledge regarding the Plaintiff's damages and more specifically regarding the increased costs of discharge operations due to the water damaged oats.

     7.     Mr. Stephen F. Dapnick
             President
             U.S. Grain & Feed Ingredients, Inc.
             222 East Houston Street, Suite 610
             San Antonia, Texas 78205
             Telephone: (210) 227-9221

Mr. Dapnick has knowledge regarding the commercial value of the oats at the time of discharge.

     8.     Mr. Kerry Manuel
             James P. Joiner Company
             229 Jackson Street, Suite 135
             Anoka, Minnesota 55303
             Telephone: (763) 422-9220

Mr. Manuel has knowledge regarding the commercial value of the oats at the time of discharge.

9.    Mr. Mervyn Tansley

It is our understanding that Mr. Tansley attended the discharge of the vessel on behalf of the vessel owner and its P&I Club.

## D.  DOCUMENTS AND TANGIBLE THINGS RELEVANT TO DISPUTED FACTS IN POSSESSION OF "HANSEN"/PLAINTIFF

The following documents and tangible things relevant to the disputed facts in this lawsuit and in the possession, custody, or control of "Hansen"/Plaintiff are disclosed as follows:

1.    The Charter Party pertaining to the vessel and voyage in question dated 11/13/00.

2.    Bill of Lading KCSPSEATRASHOU01 dated 11/23/00.

3.    The commercial invoice regarding Hansen's purchase of the Swedish oats dated 11/27/00.

4.    Capt. I.S. Derrick's damage survey report M2-00300 and attachments dated 3/16/01.

5.    Damage documentation regarding extra charges and expenses incurred by Hansen as a result of the water damaged oats (pages 1-6).

6.    Capt. I.S. Derrick's commercial invoice for services rendered dated 3/16/01.

## E.  DAMAGES

The documents listed above provide support for the damages claimed by the Plaintiff, "Hansen". The I.S. Derrick survey report and attachments specifically detail the damages sustained by the Plaintiff.

Plaintiff's initial Rule 26 disclosures are made on the basis of information reasonably available to it at this time. There may be other individuals not identified above who have knowledge of relevant facts not currently known to the Plaintiff or employed by or subject to the control of other parties. The Plaintiff has not yet made a determination regarding all the individuals who may be

4

retained or specifically employed to provide expert testimony in this case.

Respectfully submitted,

STEVEN P. VANGEL
Texas Bar No. 20465800
SDTX I.D. No. 4065
712 Main Street, Suite 1515
Houston, Texas 77002
Telephone: (713) 222-1515
Facsimile: (713) 222-1359

ATTORNEY IN CHARGE FOR PLAINTIFF
HANSEN-MUELLER COMPANY

OF COUNSEL:

HILL RIVKINS & HAYDEN LLP

## CERTIFICATE OF SERVICE

On this the 16th day of November, 2001, a true and correct copy of the foregoing was duly
served via certified mail, return receipt requested, to:

Dimitri Georgantas
GEORGANTAS & WALTERS, L.L.P.
Two Houston Center
909 Fannin Street, Suite 560
Houston, Texas 77010

5

# WORKING COPY

JOHN F. DILLON & CO.
CHARTERING BROKERS
CLEARWATER HOUSE, 9th FLOOR
2187 ATLANTIC STREET
STAMFORD, CT 06902-6800

**BALTIMORE FORM C BERTH GRAIN CHARTER PARTY** (Adapted 1963)

APPROVED BY NORTH AMERICAN EXPORT GRAIN ASSOCIATION, INCORPORATED, NEW YORK

NORTH AMERICAN SHIPPERS ASSOCIATION, LONDON

NEW YORK PRODUCE EXCHANGE, NEW YORK

Amended 1st July 1974

*Stamford, Connecticut - November 13, 2000 ,19* .....................

*JFD Reference Number 4502*

## It is this day Mutually Agreed, between *Sarnia Corporation Ltd., Georgetown, Grand Cayman* as ............... disponent owners/owners/time chartered owners of the ............... 1

| | | |
|---|---|---|
| **OWNERS DESCRIPTION OF VESSEL.** | *St. Vincent and Grenadines* (flag) *SS/MV* ............... *Dry Cargo/ "SEA TRADER" see Clause No. 54 Tanker* ............... of *39,132 metric* ............... **Call Sign:** ............... | 3 |
| | built *1985* ............... et ............... , of ............... tons of 2,240 lbs. | 4 |
| | total deadweight, or thereabouts, on a Summer draft of ............... feet ............... inches salt water, and guaranteed ............... | 5 |
| **CLASSIFICATION** | tons of 2,240 lbs, ............... percent more or less cargo capacity, quantity at owners option, classed *100A1* ............... in *Lloyds or equivalent,* | 6 |
| | now *provisional ETA Udevalla November 15/16, 2000 (completing Monday AM)* ............... | 7 |
| | ............... | 8 |
| **CHARTERERS** | and *HANSEN-MUELLER* as ............... | 9 |
| | Charterers, of *Omaha* ............... | 10 |
| **LOADING PORT(S)** | 1.   That the said vessel, being tight, staunch and strong, and in every way fit for the voyage, shall with all convenient speed proceed to *one (1) safe berth* | 11 |
| | *Udevalla where vessel's draft not to exceed 9.2 meters local density water* | 12 |
| | ............... | 13 |
| **CARGO** | and there load, always afloat, a full and complete cargo, of *in bulk oats* , subject to limits above guaranteed, of WHEAT and/or CORN and/or RYE and/or SORGHUMS | 14 |
| | SOYBEANS, at Charterers' option. Charterers also have the option of loading *28,500/30,000 metric tons minimum/maximum exact quantity in Owners' option* | 15 |
| | *stowage factor about 53 cubic feet per metric ton without guarantee.* ............... | 16 |

*Cargo to be loaded in unobstructed main holds only without bagging or strapping* .................................................................... 17

**SEPARATIONS**
2.   Cost or cargo separations; *other than natural separations in excess of three*, to be for Charterers' account. 18

3.   a)   Master to advise (telegraphic address): ................................................................................................ 19

**ADVICE OF**
**READINESS**   expected readiness at loading range *see Clause 58 when vessel sails from last port on previous voyage* and also approximate quantity of cargo required Master or Owners to advise 20

     b)   Master to advise by radio to ............................................. (telegraphic address" .......................................... ") of any change in the vessel's expected time of arrival at loading range, whilst on passage. 21, 22

**LOADING PORT**
**ORDERS**   ~~for first or sole loading port orders 96 hours before the vessel is due off the~~ ............................... ~~and Charterers/Agents are to give first or~~ 23, 24
~~sole loading port orders by radio within 48 hours of receipt of Master's application, unless given earlier. If Master's application is received on a Saturday, the time allowed~~ 25
~~to Charterers shall be 52 hours instead of 48 hours as above.~~ 26

**VESSEL**   4.   Vessel to load under inspection of National Cargo Bureau, Inc., *mandatory ship inspector and an independent, local, certified Grain Inspector holding a* 26
**INSPECTION**   ~~license issued by the United States Department of Agriculture~~
     pursuant to the U.S. Grain Standards Act, *in U.S.A. ports, or of the Port Warden and a Grain Inspector employed by the Canada Department of Agriculture, in Canadian* 27
     *ports, at her expense, in accordance with the tariff of the loading berth and to comply with their rules, not exceeding what she can reasonably stow and carry over* 28
     and above her Cabin, Tackle, Apparel, Provisions, 29

**DESTINATION**   Fuel and Furniture, and being so loaded shall therewith proceed to *see clause 71* .......................................................................................... 29, 30, 31

**DISCHARGING**   according to Bills of Lading *on having been paid 95% freight*, always afloat, except where customary for vessels of similar size to lie safely aground, or at Charterers' 32
     option, Master to apply by radio to ............................................... as ordered on signing Bills of Lading, and deliver same, 33

~~Charterers/Agents (telegraphic address~~ ..................................................................................) 34

**"ORT(S) ORDERS**   ~~for first or sole discharging port orders 96 hours before vessel is due off at see clause 71.~~ 35
~~and Charterers/Agents are to give first or sole discharging port orders by radio within 48 hours of receipt of Master's application unless given earlier. If Master's application~~ 36
~~is received on a Saturday the time allowed to Charterers or their Agents shall be 52 hours instead of 48 hours.~~ 37

**FREIGHT RATE(S)**   5.   Rate of freight *U.S.$17.25 (seventeen dollars and twenty-five cents) U.S. currency per metric ton f.i.o. and spout trimmed basis 1/1* ............... 38, 39, 40, 41, 42

**EXTRA PORTS**

6. ~~Charterers have the option to load the vessel at a second port at~~ .................................................. .....*extra* .... . . . . .. ...  43 44

~~Orders for second port of loading, if used, to be given to Master~~ .................... 45

7. Charterers have the option to discharge the vessel at a second port at *U.S.$1.50 (one dollar and fifty cents) U.S. Currency per metric ton* 46 47 48
.................... *extra on entire cargo, if used.* .................... 49

~~Orders for second port of discharge, if used, to be given to Master~~ 50

8. ~~If vessel discharges in the UNITED KINGDOM including NORTHERN IRELAND, freight shall be payable concurrently with discharge, to Owners or their~~ .................... ~~in British Sterling, on English weight delivered, less a deduction~~ 51 52
~~designated Agents at~~ ~~for demurrage of 2 lbs. per 2000 lbs. of grain discharged if weighed at time of discharge by approved Hopper Scale in drafts of 2000 lbs. or over.~~ 53

9. ~~For all other destinations freight shall be payable concurrently with discharge to Owners or their designated Agents at port or ports of discharge on return~~ 54
~~weights, in United States funds or, at Charterers/Receivers' option, in local currency freely transferable to United States funds~~ 55

**PAYMENT OF FREIGHT**

*See Clause No. 53.* .................... 56 57

**SIGNING BILLS OF LADING**

10. Captain to call at Charterers', or their Agents' office as requested, and sign Bills of Lading as presented in the form customary for grain cargoes, without prejudice to this Charter Party. If Bills of Lading are not ready for signature, the Captain is to deliver to Charterers, or their Agents at loading port(s) a signed copy of his written authority to his agents at loading port(s) to sign Bills of Lading on his behalf *always in conformity with Mate's Receipts.* ~~In the event Charterers require that bills of Lading show a rate of freight different from that indicated above, Charterers guarantee to pay Owners full freight in accordance with this contract, to be adjusted at the time of final freight settlement.~~ 58 59 60 61 62 63

**STEVEDORES AT LOADING PORT(S)**

11. Stevedores at loading/*discharging* port(s) employed by vessel to be ~~appointed~~ *approved* by Charterers/Receivers, except *if vessel is loaded at see Clause* 64
*No. 55.* .................... 65 66

.................... ~~then Charterers/Stevedores to be appointed at~~ 65 66
~~(rates current at the loading berth(s) (published tariff rate). In all cases Stevedores to be paid by the Owners and to remain their servants.~~

**LAYTIME AT LOADING**

12. Vessel to be loaded ~~according to Berth Terms in~~, *and spout trimmed free of expense to the vessel at the average rate of 5,000 metric tons per* weather working days of twenty-four 67
consecutive hours each, *time from Friday 4:00 PM/Monday 8:00 AM not to count even if used. On a day preceding a legal/local holiday time not to count* 68
*from 4:00 PM until 8:00 AM next working day, even if used.* ~~Sundays and Holidays excepted. Laytime on Saturdays to be completed as follows:~~
a) ~~Notwithstanding any custom of the Port to the contrary, Saturday shall not count as laytime at loading and discharging port or ports where stevedoring labour and/or~~ 69

~~grain handling facilities are unavailable on Saturday overtime is available only at overtime and/or premium rates.~~

b) ~~in ports where only part of Saturday is effected by such conditions, as described under (a) above,~~ laytime shall count until the expiration of the last straight time (70)
~~period.~~ (71)

c) ~~Where or more hours of work are performed at normal rates, Saturday shall count as a full layday.~~ (72 / 73)

13. a) If vessel is delayed longer at loading port(s) than provided in clause 12 Charterers to pay Owners demurrage at the rate of **U.S.$7,000** .................. (74)
per day or pro rata for part of a day *for laytime used in excess of allowed laytime provided such delay shall occur by fault of Charterers or their agents.* If sooner (75)
despatched Owners to pay Charterers

**DESPATCH**

despatch at **U.S.$3,500** ........................................................ per day or pro rata for part of a day for all *working laytime saved both ends.* (76)

~~Charterers to have the option to deduct despatch from payment of freight.~~ *Laytime is to be non-reversible both ends.* (77)

b) If vessel is delayed longer at the discharge port(s) or despatched sooner than provided in Clause 20, then Owners to collect demurrage or pay despatch as (78)
per rates above. ***Demurrage to be guaranteed and paid by Charterers.*** (79)

**LOADING/DISCHARGE DEMURRAGE/**

14 Notification of the vessel's readiness to load and/or discharge at the first or sole loading ~~or discharging~~ port must be delivered at the office of (80)

*only during* ... Charterers/Receivers or their Agents, at or before 4 P.M. on any normal business day (at or before 12 o'clock noon, if on Saturday, unless Saturday is a holiday) ~~can~~ (81)

**"TIFICATION OF ...NESS TO LOAD AND/OR DISCHARGE**

also having been entered at the Custom House, accompanied at loading port(s) by: *Notice of Readiness is not acceptable on Sundays or holidays. If port is* (82)
*congested or berth is occupied, or if Suppliers/Charterers order the vessel to wait at anchorage, then Notice of Readiness may be given at the* (82)
*anchorage by cable/telex/FAX, time to count as per Line 95* (83)

a) ~~In United States Ports:~~ (83)
~~Certificate of readiness for all Cargo Compartments issued by the National Cargo Bureau, Inc.;~~ (84)
I. ~~Certificate that all Cargo Compartments are free of insect infestation, and objectionable odours issued by a Grain Inspector holding a licence~~ (85)
II. ~~issued by the U.S. Department of Agriculture pursuant to the U.S. Grain Standards Act, or other official body customarily issuing such~~ (86)
~~certificate;~~ *In Swedish ports, Certificate of Readiness for Cargo Worthiness issued by an independent, competent local ship inspector.* (87)
*Certificate that all compartments are free of insect infestation and objectionable odors issued by a local, independent, competent grain* (82)
*inspector.*

b) ~~In Canadian ports:~~ (88)
~~Certificate of Readiness for all Cargo Compartments issued by the Port Warden;~~ (89)
I. ~~Certificate that all Cargo Compartments are free of insect infestation, and objectionable odours issued by a Grain Inspector employed by the~~ (90)
II. ~~Canada Department of Agriculture or other official body customarily issuing such certificate(s) (and/or U.S. Grain Inspector if loading U.S.~~ (91)
~~grain in a Canadian port)~~ (92)

~~and also confirmation, in Master's Notice of Readiness that Vessel's gear certificate is required by U.S. Department of Labour, or any similar authority,~~ (93)
~~where applicable, is in order;~~ (94)
and the laydays will then commence at 8 A.M. on the next business day, whether in berth or not. *Any time used prior to commencement of laytime not to count* (95)
*even if used*

~~At second and subsequent ports of loading and/or discharges, if used, time to count at the beginning of the next regular working period after notification of vessel's~~ (96)
~~readiness to load or discharge has been delivered at the office of the Charterers/Receivers or their agents during ordinary business hours, vessel also having been~~ (97)
~~entered at the Custom House, whether in berth or not.~~ (98)

**LAYDAYS**

15. Time for loading, if required by Charterers, not to commence before 8 A.M. on *13th day of November, 2000* ~~49~~ ...................... (99)

**CANCELLING DATE**

16. Should the Notice or Readiness at loading port not be delivered as per Clause 14 by *4:00 P.M.* ~~twelve o'clock noon~~ on the *20th* .............. (100)

day of ***November, 2000*** ......................... ~~49~~ ........ the Charterers or their Agents shall at said hour and at any time thereafter, but not later than the (101)
presentation of Notice of Readiness together with the required certificates at said office, have the option of cancelling this Charter Party. (102)

**BERTHS**

17. a) At loading port(s) Charterers are entitled to up to *one (1) safe* ~~three~~ loading berths per port free of expense to Charterers. *Charterers also have the liberty of* (103)
*additional*

loading, berths per port, and for berths used over three at each port, all shifting expenses including bunker fuel used to be for Charterers' account and all laytime used for shifting to count.                                                                                                                                                 104/105

b) At each port of discharge Charterers'/Receivers' have the option of two or more discharging berths, all shifting expenses including bunker fuel used to be for Charterers' account and all laytime used for shifting to count.                                                                                                                  106

*Charterers/Receivers' account, and all laytime used for shifting to count. Shifting expenses in Houston to be for Owners' account but time to count as laytime except during excepted periods.*                                                                                                                                                   107

c)   Shifting/warping as ordered by the Elevator Authorities/Port Authorities/National Cargo Bureau/Port Warden for any purpose not to be counted as additional loading/discharging berths.                                                                                                                                                            108/109

18.   Any securing (lagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Owners and time used not to count as laytime.                                                                                                                                       110/111

19.   If vessel is unable to enter Avonmouth or Hull or Glasgow immediately upon arrival owing to congestion, vessel shall be permitted to tender on arrival at anchorage in Walton Bay or Spurn Head or Tail of the Bank, as applicable, and laytime to commence in accordance with clause 14. Time shifting from anchorage to discharge berth not to count as laytime.                                                                                      112/113/114

| LARGE TERMS | 20.   Cargo to be discharged *free of risk to the vessel* /received at the average rate of 5,000 metric ................... tons per weather working day of 24 consecutive hours *Friday 5PM to Monday 8AM each, provided vessel can deliver at this rate. Sundays and Holidays excepted even if used discharging for all ports except Houston which is 10,000 mts per weather working day of 24 consecutive hours, Friday 1700 hours to Monday 0800 hours Sundays and holidays excepted even if used and 6 hours turn time even if used. New Orleans is 10,000 mts per wwd of 24 consecutive hours Sundays and holidays included except for public holidays. Saturdays to be completed as per clause 13.* | 115/116 |

21.   Stevedores at discharge to be appointed by *Charterers/Shippers at load and Charterers/Receivers at discharge and paid by free of expense to Owners ..................*                                                                                                                                                                                     119

*if* discharging in the United Kingdom, including Northern Ireland, and if required by Charterers, vessel to discharge at Receivers' berth, provided same is accessible and available and workable on arrival or time to count. When discharging at Receivers' wharf or berth if required, Receivers' stevedores to be employed at the current rate of the port at the time of commencement of discharge.                                                        120/121/122

| SEAWORTHY TRIM | 22.   *If ordered to discharge at two (2) or more ports, vessel is to be left in seaworthy trim between discharging berths/ports to Master's satisfaction to proceed bet* | 123 |

.................................................................................................................................................................................................                                                                                                                                 117

.................................................................................................................................................................................................                                                                                                                                 118

23.   Overtime at loading and discharging ports shall be for account of the party ordering same, except overtime for vessel's officers and crew always to be for Owners' account. *See Clause No. 63.*                                                                                                                                              124/125

| OVERTIME | 24.   If required, master to give free use of vessel's winches and power to drive the gears, runners, ropes and slings as on board, and winchmen from the crew. If shore regulations do not permit the crew to work winches, then shore winchmen, if used, to be for Charterers' account at loading port(s) and Receivers' account at discharge port(s), Master also to give free use of vessel's lighting as on board, if required, for night work. | 126/127/128 |

| CHES POWER AND LIGHTS | | |

25.   Should the vessel be ordered to discharge at a place at which there is not sufficient water for her to get the first tide after arrival without lightening, and she always afloat, lay days are to count from 48 hours after her arrival at a safe anchorage for similar vessels bound for such place and any lighterage incurred to enable her to reach the place of discharge is to be at the expense and risk of the Receiver of the cargo; any custom of the port or place to the contrary notwithstanding; but time occupied in proceeding from the anchorage to the port of discharge is not to count.                                                                            129/130/131/132

| LIGHTERAGE CLAUSE | | |

26.   *Owners to appoint and use Charterers' nominated* Agents to be employed at loading port(s) and at both ends. ........ Agents to be employed at discharging *port(s). General agents both ends are: K&C Shipping Inc., 917 North Carrollton Avenue, New Orleans, LA 70119, USA, Tel: 504 486 0994, fax: 504 482 1060, e-mail: kcship@kcship.com, contact: Vince Barber*                                                            133

| AGENTS | | |

27.   At *loading and discharging* port(s), vessel's *crew is* to open hatches and remove beams, also to close hatches and replace beams all at vessel's time, risk and expense *provided port regulations permit, otherwise to be for Charterers'/Receivers' expense, see Clause 59*                                                            134

Dismantling of shifting boards or hulking if any at discharging port(s) to be at Owners' time, risk and expense.

135

**BROKERAGE COMMISSION**

28. A brokerage commission of 5 ......... percent on gross freight, dead freight and demurrage is payable by Owners to *JOHN F. DILLON & CO., Stamford for*  136

*division* ...........................................................................................................................................................................  137

vessel lost or not lost, this contract performed or not performed, and all such commission shall be considered earned and due *and payable on vessel being loaded* upon  138
~~signing of this Charter Party. With~~  139
Charterers' approval this brokerage commission may be deducted from the freight at time of payment, for remittance to broker(s).  140

**ADDRESS COMMISSION**

29. ~~An address commission of~~ ......................................................... *% on gross freight, dead freight and demurrage is due to charterers on shipment of cargo, vessel lost*  141
or not lost, charterers having the right to deduct such commission from payment of freight.  142
*Penalty for non-performance of this agreement, estimated amount of freight.*

**LIEN**

30. Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average.  143

**CESSER CLAUSE**

31. Charterers' liability under this Charter to cease on cargo being shipped, *except for payment of freight, deadfreight and demurrage*  144
this Charter.  145

**ASSIGNMENT**

32. Charterers, or their Agents, have the privilege of transferring/assigning all or part of this Charter to others, guaranteeing to the Owners the due fulfilment of  145
  146

**GENERAL AVERAGE NEW JASON CLAUSE**

33. General Average shall be payable according to the York/Antwerp Rules 1974 *amended 1990* and be settled in .. *London* .................  147
34. Where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:  148
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence  149
or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or  150
owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature  151
that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.  152
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as  153
the carrier or his agent may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required,  154
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."  155
and the charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.  156

**ARBITRATION**

35. ~~Any dispute between Owners and Charterers arising out of this Charter shall be arbitrated at New York in the following manner:~~  157
~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the~~  158
~~purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men.~~  159

**LONDON (delete if inapplicable)**

36. All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of  160
two Arbitrators carrying on business in London who shall be Members of the Baltic and engaged in the Shipping and/or Grain Trades, one to be appointed  161
by each of the parties, with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimants' Arbitrator appointed  162
within *twelve (12)* ~~three~~ months of final discharge and where the claim is not complied with the claim shall be deemed to be waived and absolutely barred.  163
No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his acting be taken  164
before the award is made. *English law is to apply.*  165

**EXCEPTIONS CLAUSE**

37. It is also mutually agreed that the Carrier shall not be liable for loss or damage occasioned by causes beyond his control; by the perils of the seas or other waters,  166
by fire from any cause, wheresoever occurring, by barratry of the master or crew, by enemies, pirates or robbers; by arrests and restraint of Princes,  167
rulers or people, by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances, by collisions, stranding or other accidents  168
of navigation of whatsoever kind (even when occasioned by the negligence, default or error in judgment, of the pilot, master, mariners or other servants  169
of the ship owner, not resulting, however, in any case, from want of due diligence by the owners of the ship or any of them, or by the Ship's Husband  170

or Manager)

**WAR RISKS CLAUSE**

38. (1) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

(2) The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or by any other Government or any department thereof or any person acting or purporting to act with the authority of such Government, or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

**STRIKE CAUSE**

39. If the cargo cannot be loaded by reason of riots, civil commotions or of a strike or lock-out of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages beyond the control of the Charterers caused by riots, civil commotions or a strike or lock-out on the railways, or in the docks, or other loading places, or if the cargo cannot be discharged by reason of riots, civil commotions, or of a strike or lock-out of any class of workmen essential to the discharge, the time for loading and/or discharging, as the case may be, shall not count during the continuance of such causes, provided that a strike or lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage from accruing if by the use of reasonable diligence they could have obtained other suitable labour at rates current before the strike or lock-out. In case of any delay by reason of the beforementioned causes, no claim for damages or demurrage shall be made by the Charterers/Receivers of the cargo, or Owners of the ship. For the purpose, however, of settling despatch accounts, any time lost by the ship through any of the above causes at loading port(s) shall be counted only as time used in loading, and, if occurring at discharging port(s) only to be counted as time used in discharging.

**P AND I BUNKER CLAUSE**

40. The ship shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter Party and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

**BOTH TO BLAME COLLISION CLAUSE**

41. If the liability for any collision in which the ship is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:—

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

The foregoing provisions shall contain the same clause.

and the charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

42. It is also mutually agreed that this contract shall be completed and superseded by the signing of Bills of Lading which shall be deemed to incorporate the above clauses as well as containing the following additional clause(s):

**U.S.A. CLAUSE PARAMOUNT**
(delete if inapplicable)

"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further."

**CANADIAN CLAUSE PARAMOUNT**
(delete if inapplicable)

~~"This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act, 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further."~~

171
172
173
174
175
176
177
178
179
180
181
182
183
184
185
186
187
188
189
190
191
192
193
194
195
196
197
198
199
200
201
202
203
204
205
206
207
208
209
210
211
212
213
214
215

*Clauses Numbers 43 to 71 both inclusive, as attached hereto, are to be fully incorporated in and form part of this charter party.*

This Charter Party is a computer generated copy of the BALTIMORE FORM C BERTH GRAIN CHARTER PARTY (Adapted 1983) form printed using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original approved document shall apply. STRATEGIC SOFTWARE LTD. assume no responsibility for any loss or damage caused as a result of any discrepancies between the original approved document and this document.

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 14 of 57

RIDER TO CHARTER PARTY OF THE M/V 'SEA TRADER'
DATED NOVEMBER 13, 2000 - JFD REFERENCE NUMBER 4502

43. Owners of the vessel are:  Sarnia Corp. Ltd., Georgetown, Grand Cayman

44. Bimco ISM Clause
    From the date of coming into force of the International Safety Management
    (ISM) Code in relation to the vessel and thereafter during the currency of
    this charter party, the Owners shall procure that both the vessel and 'the
    company' (as defined by the ISM Code) shall comply with the requirements of
    the ISM Code. Upon performing Vessel's nomination, the Owners shall provide
    a copy of the relevant Document of Compliance (DOC) and Safety Management
    Certificate (SMC) to the Charterers.

45. Notice of Readiness to be presented in accordance with charter party terms
    and conditions accompanied by necessary passes of the local port/grain
    authorities at load, and accepted during normal office hours Monday through
    Friday 0800 hours to 1600 hours both ends and time to count as from 0800
    hours next working day. Notice of Readiness at load can only be tendered
    when Vessel is at the load berth or load anchorage and has passed necessary
    inspections. Notice of Readiness at discharge to be tendered at discharge
    berth. If discharging in Mississippi River, Notice of Readiness may be given
    Sundays and holidays included. If berth or anchorage is occupied, master can
    give Notice of Readiness by cable whether in port or not, whether in berth
    or not, whether in free pratique or not, whether customs cleared or not.

    Owners/Master are always to direct communications with discharging port
    authorities for matters relating to the vessel/cargo strictly through the
    vessel's discharging port agents.

46. If fumigation of cargo is required, Charterers may effect same, always in
    strict compliance with regulations in effect at place of fumigation. Upon
    completion of fumigation the Master is to be furnished with a Gas Free
    Certificate covering 'upon deck, crew accommodation, and engine space'
    issued by an authorized Association. All costs of fumigation, including
    accommodations, meals and transportation of crew, if so decided necessary by
    an authorized independent surveyor, to be for Charterers' account and all
    time lost to count as laytime.

47. Any dues and/or taxes on vessel and/or freight, to be for Owners' account.
    Any dues and/or taxes on cargo to be for Charterers' account both ends.

    Owners pay all customary port charges both ends.
    Fairway dues on vessel in Sweden are to be for Owners' account.
    Fairway dues on cargo in Sweden are to be for Shippers' account.

48. Cargo to be loaded in unobstructed main holds only.  No cargo to be loaded
    in wing tanks or any other inaccessible places.

49. Laydays are non-reversible at both ends.

50. Owners guarantee that vessel is suitable for being discharged by shore
    grabs.  Time and cost if shore grabs used to be for Charterers'/ Receivers'
    account.  Shore equipment and any other equipment such as bulldozers
    required in the discharging of vessel, to be supplied by Charterers at their
    risk and expense.

RIDER TO CHARTER PARTY OF THE M/V 'SEA TRADER'                    2
DATED NOVEMBER 13, 2000 - JFD REFERENCE NUMBER 4502

51. In the event of the vessel being unable to berth immediately on arrival at
    loading or discharging port or place on account of congestion, the vessel
    shall be permitted to present Notice of Readiness in accordance with the
    Charter Party by cable or radio at the anchorage/layby berth as designated
    by Port Authorities and the laytime is to count as per Charter Party at or
    off the port, whether in berth or not, whether entered at the Customs House
    or not and whether in free pratique or not.

52. Owners P & I Club is:

53. Ninety-five percent (95%) freight is payable within three (3) banking days
    after signing and releasing clean on board Bills of Lading provided in
    accordance with Mate's receipts marked 'freight payable as per Charter
    Party' less address commission/brokerage commission.  Charterers' option to
    have Bills of Lading marked 'freight prepaid/clean on board' in which case
    Charterers to pay one hundred percent (100%).  Basis Bills of Lading marked
    'freight payable as per Charter Party', balance of five percent (5%) freight
    to be settled upon Charterers' receipt of Owners' final freight account
    supported by Statement of Facts/Notice of Readiness but latest thirty (30)
    days after completion of discharge.

    Upon receipt of a tested telex by Owners' bank, (telex number:      ) from
    Charterers' paying bank certifying that freight has been irrevocably
    transferred, Owners to effect immediate signature and release of original
    Bill(s) of Lading marked 'freight prepaid' as soon as they are made
    available by Charterers or their agents.

    Freight is payable to:

        CHASE MANHATTAN BANK, NEW YORK
        SWIFT CODE:              CHASUS33
        IN FAVOR OF:            CHASE MANHATTAN BANK, LONDON
        SWIFT CODE:             CHASGB2L

        A DIRECT ADVICE (MT100)
           TO BE SENT TO:       CHASE MANHATTAN BANK, LONDON
                                (SWIFT CODE - CHASGB2L)
        ADVISING FUNDS IN FAVOUR
           OF A/C NO:           22002810 - FIRST RAND BANK LTD.
        FOR FURTHER CREDIT TO
           ACCOUNT NO:          180 102 2301- SOUTH AFRICAN MARINE
                                CORPORATION (PTY) LTD

        REF.: MV "SEA TRADER" FREIGHT - HANSEN MUELLER.

        BANK CHARGES ARE FOR THE ACCOUNT OF THE REMITTER.

54. Vessel's Description:
    M/V Sea Trader
    Built 1985
    Saint Vincent and Grenadines Flag
    Single Deck Bulk Carrier
    39,132 mt dwat on 10.932 m ssw
    1,628,430 cubic feet grain

RIDER TO CHARTER PARTY OF THE M/V 'SEA TRADER'          3
DATED NOVEMBER 13, 2000 - JFD REFERENCE NUMBER 4502

     5 ho/ha, 4 cranes @ 25 mt swl
     180.80/30.50 m LOA/beam

     1) Holdwise cubics:
        1-5/281147/346342/346839/348030/306072 = 1628430 cuft
     2) Type and dimension of Hatchcovers:
        IHI end folding 4 paneless type
        Dims 1/15.2 x 12.8 and 2-5/19.2 x 15.2m
     3) last three cargoes: Starting last concentrates/grain and aluminite ore.
     4) history of any accidents, breakdowns, etc. including notations
        against vessel from port state inspections and/or class society
        over the past 12 months. Full style of head owners, disponent owners,
        t/c owners including fax/telephone/telex: no history -- (still awaiting
        full style of headowners, disponent owners, and t/c owners including
        fax/tel/tlx)
        Owners : Sarnia Corp. Ltd, Georgetown, Grand Cayman

55. Any stevedore damage done to the vessel at loading and discharging ports to
    be settled directly between Owners and stevedores, but Charterers to assist
    Owners.

56. Vessel is to be classed highest Lloyd's Register or equivalent (with an IACS
    member) and shall remain so throughout the entire duration of the voyage.

57. Owners to have secured and carry on board a U.S. Federal Maritime Commission
    Certificate of Financial Responsibility as required under the U.S. Quality
    Improvement Act of 1970 and any subsequent enactments. Charterers shall not
    be liable for demurrage as a result of Owners failure to obtain
    aforementioned certificates.

58. Captain of the ship to send information after vessel leaves loading port as
    follows:
    -    exact quantity of goods loaded;
    -    ETA discharging port;
    -    Captain to give five (5) days definite pre-advice of arrival to
        Discharge port;
    all above information to be sent to:
    -    agents at discharging port.

    Once performing vessel has been nominated Master/Owners to give notice on
    fixing of vessel's arrival at loading port to:

    -    John F. Dillon & Co. and notice to vessel's agents on Saturday
        November 11th/Monday November 13th, 2000.

59. The crew to perform all opening/closing of hatches. The Master to close the
    hatches whenever same requested by Shippers or Receivers to protect cargo
    from weather conditions. If opening/closing of hatches by crew is not
    permitted same to be arranged by Charterers at their expense. First opening
    and last closing of hatches always to be at Owners' time and expense both
    ends.

60. Negotiations and eventual fixture to be absolutely private and confidential.

<u>RIDER TO CHARTER PARTY OF THE M/V 'SEA TRADER'</u>
<u>DATED NOVEMBER 13, 2000 - JFD REFERENCE NUMBER 4502</u>

61.  <u>Gypsy Moth Clause</u>
     Owners herewith confirm that the vessel has not called at Soviet Far East
     ports ranging from Posyet to Olgo Bay including Vladivostok, Nakhodka and
     Vostochny during the months of June through August and that no Asian Gypsy
     Moth or its Larvae is to be present on board the vessel. If vessel fails
     inspection for this reason, all costs/con-sequences to be for Owners' time
     and account.

62.  Vessel to be allowed to present Notice of Readiness with water ballast     in
     wing tanks and/or ballast holds provided these spaces are clean and able to
     receive the cargo when required.  In the event the above mentioned
     compartments are not ready for loading when required, then laytime to count
     pro rata until they are passed for loading.

63.  At loading port overtime to be for the account of party ordering it, but if
     ordered by port or elevator authorities, to be for Charterers' account.

     At discharge port, overtime shall be for the party ordering it.  If overtime
     is ordered by the port authorities the cost of same to be equally shared
     between Charterers/Receivers.  Officers and crew overtime always to be for
     Owners' account.

64.  Any extra insurance due to Vessel between 16-20 years is to be for Owners'
     account but maximum U.S.$6,500 against supporting original vouchers only.

     Any extra insurance due to vessel's flag, class, ownership is to be for
     Owners' account.

65.  Vessel to have on board an approved trim and stability normal certificate in
     accordance with requirement of Chapter 6 of SOLAS Regulation 1974 and any
     additional trimming beyond self-trimming to be for Owners' time and expense.

66.  If intaken cargo quantity cannot be determined by elevator weights, then the
     Charterers, Shippers and Owners shall conduct a joint draft survey, using
     Charterers nominated surveyor at Charterers' expense, in order to determine
     same. The Master shall represent the Owners during this survey. Joint survey
     to be held and intaken cargo weight to be calculated by joint survey
     results. Plimsoll mark amidship and draft mark on port and starboard side,
     bow and stern are to be clearly cut and marked on shell plating.

67.  The Owners of the vessel guarantee that the minimum terms and conditions of
     the crew of the vessel are or will be prior to presentation of vessel for
     loading and will remain for the period of the charter party covered by an
     ITF agreement or bona fide trade union agreement acceptable to the ITF.
     Failing the above, Owners to be responsible for all time lost, expenses and
     consequences which may arise from such failure.

68.  Owners confirm that vessel is not blacklisted by United Nations/U.S.
     government/EEC and that vessel's crew and management is acceptable by all
     above mentioned parties. Owners warrant that vessel has not traded to or
     from or with Cuba in the six months prior to commencement of this charter.
     Owners warrant that this vessel will not carry goods or passengers to and
     from Cuba during the currency of this charter and further warrant that this

Case 1:01-cv-00137 Document 9 Filed in TXSD on 11/16/2001 Page 18 of 57

5.

vessel is not owned/managed/controlled by or associated with any Cuban national.

69. In the event of non-availability of original Bills of Lading at discharging port, Owners/Master to discharge entire cargo against Charterers/Receivers/Shippers Letter of Indemnity as per Owners P & I Club wording signed by Charterers and Receivers. The Owners are to accept a faxed signature for purposes of issuing Letter of Indemnity.

70. **Bimco Standard Year 2000 Clause**
'Year 2000' conformity shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical of similar equipment will be affected by dates prior to or during the year 2000.

Without prejudice to their rights, obligations and defenses under this Charter Party including, where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

71. **Discharge Port**
One safe berth, safe anchorage, or safe midstream buoy, in Charterers' option, 1/2 safe ports, in Charterers' option, out of Baton Rouge, Houston, Brunswick, Pascagoula, or Mississippi River. If Mississippi River, vessel is to discharge at 1 safe anchorage or 1 safe midstream buoy not above including Baton Rouge. Charterers are to declare if Brunswick will be the first discharge port 5 days prior to vessel's ETA notice. Otherwise the first discharge port is to be declared upon vessel's notice to Charterers, during office hours, that vessel is passing Key West west. Second discharge port, if used, is to be declared upon arrival at the 1st loadport. Second discharge port, if used, to be in geographical rotation.



Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 19 of 57

CODE NAME: "CONGENBILL" EDITION 1994

**BILL OF LADING**

TO BE USED WITH CHARTER-PARTIES

B/L No. KCSPSEATRASHOU01

Reference No.

**Shipper**

Odal ek. för.
Box 905
601 19 Norrköping
Sweden

**Consignee**

Hansen-Mueller Company
12231 Emmet Street
Omaha, NE 68164

**Notify address**

Russel Marine Supervisory
101 Woodland Highway
Belle Chasse, LA 70037

# ORIGINAL

| Vessel | Port of loading |
|---|---|
| M/V Sea Trader | Uddevalla, Sweden |

**Port of discharge** Brunswick, Pascagoula, Houston and Mississippi River port, including but not above Baton Rouge. United States of America

| Shipper's description of goods | Gross weight |
|---|---|
| Swedish oats in bulk | 29140842   kilos |
| Clean on board | |
| Freight payable as per Charter Party | |

(of which                    on deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

Freight payable as per CHARTER-PARTY dated . . . . . . . .      . . . .    . . . . . . .

FREIGHT ADVANCE.
Received on account of freight:

. . . . .   . . . . . . . .  . . . . .      . . . . . . . .    . . . .   . . . .

Time used for loading    . . . . . . . . . . days .  . .   . .  hours.

**SHIPPED** at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.

Weight, measure, quality, quantity, condition, contents and value unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
|---|---|
| As per C/P | Uddevalla |
| **Number of original Bs/L** | **Signature** |
| Three/3 | |

Printed and sold
by Svanberge Trycken AB, Box 91, 351 03 Växjö,
by authority of The Baltic and International Maritime Conference,
Copenhagen.

# BILL OF LADING

TO BE USED WITH CHARTER-PARTIES
CODE NAME. "CONGENBILL"
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) **General Paramount Clause.**

    (a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

    *(b) Trades where Hague-Visby Rules apply.*
    In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 – the Hague-Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

    (c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) **General Average.**
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) **New Jason Clause.**
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) **Both-to-Blame Collision Clause.**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight,
destination, etc., see overleaf

| Seller | *ODAL ek för* |
|---|---|

# INVOICE

| | |
|---|---|
| Name: Department: Grain division | |
| City Postal Code:   745 84  ENKÖPING | Nr 00/494 |
| Tel:   *+46 11 21 80 00*          Fax:    *+46 11 21 80 95* | Contract nr:  270-074 |
| VAT Registration No:     *SE: 69600960901* | |
| BANK: FöreningsSparbanken ,Enköping acc nr 3901-1-994.015 350-6 | |

**Buyer**
Company/Name:Hansen – Mueller Company
Name: Department:
Address: 12231 emmet Street
City Postal Code:Omaha. NE 68164
Country: USA
VAT Registration No:

Number of Pieces: Bulk
Total Gross Weight:
Total Net Weight: 29140842 kilos
Terms of Delivery: FOB

**Carrier:**
M/V SEA TRADER

| Full Description of goods | Customs Commodity Code | Country of Origin | Quantity | Unit Value and Currency | Sub Total Value and Currency |
|---|---|---|---|---|---|
| SWEDISH OATS | 1004 00 00 | Sweden | Kgs 29140842 | | SEK 24198020,00 |
| | | | | **Total Value and Currency:** | SEK 24198020.00 |

**Terms of payment: Cash**

Place and Date: Norrköping 2000-11-27

Signature: .........................

# CAPT. I. S. DERRICK



# INDEPENDENT SHIP AND CARGO

# SURVEYORS, INC.

## M/V SEA TRADER

## DAMAGE SURVEY

## SURVEY REPORT NO. M2-00300



# DIXIE SERVICES INCORPORATED

POST OFFICE BOX 451      GALENA PARK  TEXAS  77547
713 672 1619            FACSIMILE  713 672 1634                    January 9, 2001

Captain I. S. Derrick
Independent Ship & Cargo Surveyors, Inc.
12711 Woodforest Boulevard
Houston, Texas  77015

Re:  Oats submitted by Michael Goodnight 1/6/01
Vessel:  M/V SEA TRADER
Cargo:  Extra Heavy Scandinavian Oats
Importer:  Hansen-Mueiler Company

The subject sample was analyzed by atomic absorption spectrophotometry, ion chromatography and wet chemical methods.  The results of our tests are as follows:

RESULTS

| | |
|---|---|
| pH | 6.2 |
| Sodium, ppm | 2,760 |
| Potassium, ppm | 1,400 |
| Calcium, ppm | 224 |
| Magnesium, ppm | 261 |
| Chloride, ppm | 4,720 |
| Bromide, ppm | 20 |
| Nitrate, ppm | 48 |
| Phosphate, ppm | 934 |
| Sulfate, ppm | 500 |

CONCLUSION

The sodium and chloride contents of the sample are high and indicative of contact with seawater. The relatively high phosphate result is indicative of further contact with another substance having a high phosphate content.

Report No. 104884

Respectfully submitted,

Mical C. Renz

MCR/ew

**HOUSTON OFFICE**
AIMU CORRESPONDENT
(713) 451-2711 * FAX: (713) 451-4152
(800) 654-4303
12711 Woodforest Blvd. * Houston, Tx 77015

# CAPT. I. S. DERRICK

**TAMPA OFFICE**
AIMU CORRESPONDENT
(813) 626-2203 * FAX: (813) 664-1604
9280 Bay Plaza Blvd., Suite 720B
Tampa, Florida 33619

DATE: _December 29, 2000_

TO:         MASTER
            M/V _Sea Trader_

SHIPMENTS: _Approx. 15,000 tons_
            _Swedish Oats_

ON BEHALF OF _Hanson Mueller / MOAC_ , WE HEREBY SERVE NOTICE THAT THE CARGOES BELONGING TO _Hanson Mueller_ , AND CARRIED ABOARD THE ABOVE NAMED VESSEL ON THE VOYAGE JUST COMPLETED, HAVE BEEN DISCHARGED IN A DAMAGED AND NONCONFORMING CONDITION.   THESE CONDITIONS WILL BE THE SUBJECT OF POTENTIAL CLAIMS AGAINST THE VESSEL, HER OWNERS AND/OR CHARTERERS.

YOU ARE HEREBY NOTIFIED THAT THE SURVEYS TO DETERMINE THE NATURE AND EXTENT OF DAMAGES WILL BE CONDUCTED BY THE UNDERSIGNED SURVEYOR.   YOU ARE HEREBY INVITED TO APPOINT A SURVEYOR TO CONDUCT JOINT SURVEY OF THE CARGOES TO BE IN ATTENDANCE WITH THE UNDERSIGNED.

PLEASE HAVE YOUR SURVEYOR CONTACT THE UNDERSIGNED AS SOON AS POSSIBLE IN ORDER TO ARRANGE MUTUAL TIME FOR JOINT SURVEY.

THIS LETTER IS WRITTEN WITHOUT PREJUDICE TO THE RIGHTS OF WHOM IT MAY CONCERN.

SINCERELY,

_M Goodright_

STAFF SURVEYOR
CAPT. I.S. DERRICK

_For Received_

MASTER
M/V _Sea Trader_

# *Chorus Maritime LTD.*

M/V SEA TRADER
PORT OF REGISTRY: KINGSTOWN

CALL SIGN: J8EN3,OFFICIAL No:3224
FLAG: ST.VINCENT & THE GRENADES,
TYPE: +A1 BULK CARRIER +AMS,
G.R.T: 22132 TONS, N.R.T: 12639 TONS

DATE:  27 December 2000
PORT :Brownsville USA

## TO THE NOTARY OFFICE

## STATEMENT OF SEA PROTEST

*I am, Capt. **Marek Chrapkiewicz**, master of the m/v "Sea Trader"
registered at ST.VINCENT & THE GRENADES and sailing under
ST.VINCENT & THE GRENADES flag GRT 22,132 tons,
on the 23 of November 2000 sailed from Uddevalla (Sweden)
with cargo Oat 29141,840 metric tons bound to USA
 and arrived in Pascagoula (USA) on 14 of December 2000 and in
Brownsville (USA) on 23 of December 2000.*

*During voyage we encountered very heavy weather with W, SW, WNW winds
of whole gale force and phenomenal sea; the vessel during this period was pitching
and rolling heavily, continually shipping seas and sprays on forecastle, deck and over
the hatch covers.*

*In consequence of the aforesaid weather condition I anticipate possible
damage of the cargo, which can be fount during discharging .*

*I hereby declare this Sea Protest in the event of any damage to the vessel and /
or cargo trough stress of weather conditions during voyage, or any action against
vessel due to above.*

*In case of the other damages of ship's equipment, hull, machinery, tanks, holds and
also to her cargo later will be founded from any or all of the above incidents, make
SEA PROTEST against the aforesaid high long swell, boisterous weather accidents
and occurrences, and against all and every matter and things and met with as
aforesaid, and all loss or damage occasioned thereby, reserving the right to extend
this protest at a time and place convenient.*

Capt.M. Chrapkiewicz
MASTER OF M/V SEA TRADER

Log abstract attached.

Subscribed & sworn to
before me on this 28th
day of December 2000.

Mervyn Tansley

# ACCORDING TO THE LOG BOOK ABSTRACT

Page 28
m/v "Sea Trader"

Voyage   Uddevalla - Brunswick          Date: 24 November 2000

| Time | Log | COURSE | | | Error | WIND | | Baro | REMARKS |
| | | True | Gyro | Standard | | Direction | Force | | |
|---|---|---|---|---|---|---|---|---|---|
| 12.00 | | 212 | 212 | 214 | | WSW | 8 | | V ROUGH SEA OVERCAST VSL SHIPPING SEAS ON DCK & OVER H/COVER |
| 20.00 | | 212 | 212 | 214 | | SW | 8 | | V ROUGH SEA,OVERCAST VSL SHIPPING SEAS ON DCK & OVER H/COVER |

Page 28
m/v "Sea Trader"

Voyage   Uddevalla - Brunswick          Date: 25 November 2000

| Time | Log | COURSE | | | Error | WIND | | Baro | REMARKS |
| | | True | Gyro | Standard | | Direction | Force | | |
|---|---|---|---|---|---|---|---|---|---|
| 08.00 | | 212 | 212 | 214 | | SSW | 8 | | V ROUGH SEA,CLOUDY VSL SHIPPING SEAS ON DCK & OVER H/COVER |
| 16.00 | | 230 | 230 | 232 | | SSW | 8 | | V ROUGH SEA,OVERCAST VSL SHIPPING SEAS ON DCK & OVER H/COVER |
| 24.00 | | 255 | 255 | 260 | | SSW | 8 | | V ROUGH SEA,OVERCAST VSL SHIPPING SEAS ON DCK & OVER H/COVER |

Page 29
m/v "Sea Trader"

Voyage   Uddevalla - Brunswick          Date: 26 November 2000

| Time | Log | COURSE | | | Error | WIND | | | REMARKS |
| | | True | Gyro | Standard | | Direction | Force | | |
|---|---|---|---|---|---|---|---|---|---|
| 02.30 | | | | | | | | | REDUSED REVOLUTION TO 91 DUE TO STRONG GALE TO AVOID DAMAGES FOR SH |
| 04.00 | | 255 | 255 | 260 | | W | 9/10 | | HIGH SEA P CLOUDY VSL SHIPPING SEA SWELL ON DCK AND H/COVERS |
| 05.25 | | | | | | | | | REDUSED RPM 80 DUE TO HEAVY PITCHING |
| 16.00 | | 250 | 250 | 255 | | W | 11 | | STORM HIGH SEA VSL SHIPPING SEAS ON DCK AND H/COVER |
| 24.00 | | 250 | 250 | 255 | | W | 10 | | GALE HIGH SEA VSL SHIPPING SEAS ON DCK AND OVER H/COVER |

Page 29 A
m/v "Sea Trader"

Voyage   Uddevalla - Brunswick          Date: 27 November 2000

| Time | Log | COURSE | | | Error | WIND | | | REMARKS |
| | | True | Gyro | Standard | | Direction | Force | | |
|---|---|---|---|---|---|---|---|---|---|
| 08.00 | | 250 | 250 | 257 | | SW | 9 | | HIGH SEA |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILY |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |
| 24.00 | | 250 | 250 | 256 | | SW | 10 | | GALE |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILY |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |

Subscribed & sworn to before me
on this 28th day of December 20
Meryn Tansley

Page 30

m/v "Sea Trader"

Voyage    Uddevalla - Brunswick                Date: 29 November 2000

| Time | COURSE | | | | WIND | | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | Log | True | Gyro | Standard | Error | Direction | Force | | |
| 08.00 | | 250 | 250 | 257 | | SW | 11 | | HIGH SEA OVERCAST |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILLY |
| | | | | | | | | | DUE TO CROSS SWELL |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |
| 20.00 | | 250 | 250 | 258 | | SW | 10 | | VESSEL PITCHING AND ROLLING HEAVILLY UP TO 20 DEG |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |

Page 31

m/v "Sea Trader"

Voyage    Uddevalla - Brunswick                Date: 30 November 2000

| Time | COURSE | | | | WIND | | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | Log | True | Gyro | Standard | Error | Direction | Force | | |
| 16.00 | | 250 | 250 | 264 | | W | 11 | | HIGH SEA |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILLY |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |

Page 32

m/v "Sea Trader"

Voyage    Uddevalla - Brunswick                Date: 02 December 2000

| Time | COURSE | | | | WIND | | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | Log | True | Gyro | Standard | Error | Direction | Force | | |
| 08.00 | | 250 | 250 | 264 | | W | 11 | | GALE |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILLY |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |
| 20.00 | | 250 | 250 | 264 | | W | 12 | | PHENOMENAL SEA |
| | | | | | | | | | VESSEL PITCHING AND ROLLING HEAVILLY UP TO 20 DEG |
| | | | | | | | | | VSL SHIPPING SEAS ON DECK AND HATCH COVER |

cpt.

Subscribed & sworn to
before me on this 28th
day of December 2000



US G__n & F__d I_____ts, Inc.

222 East Houston St. - Suite 610
San Antonio, Texas 78205
Telephone (210) 227-9221
Facsimile (210) 226-8934

*January 3, 2001*

**To Whom It May Concern:**

*Our company handled approximately 18,000 metric tons of Scandanavian oats through the port of Brownsville last year. I sold 3,900 metric tons of oats last week for $125.00 metric ton. If you have any questions as to the value of oats in Brownsville, Texas please feel free to contact me.*

*Sincerely yours,*

Stephen F. Dupnick
*President- US Grain & Feed Ingredients, Inc.*

Member Texas Grain & Feed Association
The corporation is not an agency or instrumentality of the government of the United States of America.

# James B. Joiner Company

*Domestic & Export Grain and Freight Brokers*

**229 Jackson Street, Suite #135, Anoka, MN 55303**
**Phone: 763-422-9220      Fax: 763-422-0519**

January 3, 2001

To whom it May Concern:

Our records indicate Last Week December oats to Brownsville, Texas, were trading at a range of $125.00 to $127.00 per metric ton.  If you have any questions you may contact me at the above numbers.

Regards,

Kerry Manuel

# Corpus Christi Grain Exchange

### Grain Inspection Department

MAIL TO: PO BOX 2369 • MAIN OFFICE 416 LANTANA

CORPUS CHRISTI, TEXAS 78405

WILLIAM V. BOHACH                                                                 (512) 289-0542

CHIEF INSPECTOR

## Weight Certificate

This is to certify that employees of the Corpus Christi Grain Exchange supervised the weighing of grain loaded aboard the barge _ATC  /302_    at Port Elevator-Brownsville, LC and the results are:

Date & Time Loading Began:   _1/9/01 – 0825_

Date & Time Loading Ended:   _1/9/01 – 1315_

Stowage:   <u>All over barge</u>

Certified Weight:   _2,303,718 LBS._

On behalf of the Corpus Christi Grain Exchange, I hereby certify that the above is true and correct.

Authorized Signature _____        _1/9/01_

                                                                                     Date

# Corpus Christi Grain Exchange

### Grain Inspection Department

MAIL TO: PO BOX 2269 * MAIN OFFICE 415 LANTANA

CORPUS CHRISTI, TEXAS 78465

WILLIAM V. BORACH

CHIEF INSPECTOR

(512) 289-0842

### Weight Certificate

This is to certify that employees of the Corpus Christi Grain Exchange supervised the weighing of grain loaded aboard the barge _MCM 5224_ at Port Elevator-Brownsville, LC and the results are:

Date & Time Loading Began: _1/9/01_ - _1440_

Date & Time Loading Ended: _1/9/01_ - _1815_

Stowage: __All over barge__

Certified Weight: _2280,880 LBS_

On behalf of the Corpus Christi Grain Exchange, I hereby certify that the above is true and correct.

Authorized Signature _M_____ _1/9/01_ .

Date

| HOUSTON OFFICE | | TAMPA OFFICE |
|---|---|---|
| AIMU CORRESPONDENT | | AIMU CORRESPONDENT |
| (713) 451-2711 * FAX: (713) 451-4152 | | (813) 626-2203 * FAX: (813) |
| (800) 654-4303 | | 664-1604 |
| 12711 Woodforest Blvd. | | 9280 Bay Plaza Blvd., Ste. 720B |
| Houston, TX 77015 | **CAPT. I. S. DERRICK** | Tampa, Florida 33619 |

INDEPENDENT SHIP & CARGO SURVEYORS, INC.

January 3, 2001

M/V SEA TRADER

INVITATION TO BID

<u>BID OPENING 2:00 P.M., Friday, January 5, 2001</u>

This sale is to be conducted on an <u>"as is where is"</u> basis, for the account of <u>"whom it may concern"</u>.

Bidders are urged to examine goods prior to bidding.

Successful bidder is to furnish a cashier's check in the full amount of their bid payable to <u>Hansen-Mueller Co.</u> and is to <u>execute a Certificate of Resale that is to be mailed with check.</u>

Successful bidder is to arrange for payment of <u>loading and transportation charges</u> which will be necessary in taking delivery of goods from present location and, upon receipt of letter of release for the merchandise, is to take immediate possession of the goods. All delay penalties are for the successful bidder's account.

It is the responsibility of the successful bidder to advise this office within <u>72 hours</u> from date of release of goods of any discrepancy in weight/quantity of goods shown on this Invitation to Bid by certified weight tickets or properly signed delivery receipts from location of the goods; otherwise, it will be assumed the full quantity shown has been received.

The right is reserved to reject any and all bids. The goods are sold expressly without warranty, guarantee and/or specifications of any nature/type.

<u>Bids:</u>   Mail, fax or deliver bids to this office so they will arrive on or before <u>2:00 P.M. Friday, January 5, 2001.</u>

Bids to be addressed to:
Capt. I. S. Derrick                     Phone:  (713)451-2711
Woodforest Professional Plaza           Fax:    (713)451-4152
12711 Woodforest Blvd.
Houston, Texas  77015
Attention: Michael C. Goodnight
File No.: M2-00300

**(CONTINUED)**

M/V SEA TRADER
INVITATION TO BID
FILE NO. M2-00300
PAGE 2


Location:   Port Elevator-Brownsville, L. C.
            Port of Brownsville
            Brownsville, Texas 78521
            Contact: Mr. Craig Elkins
                     Phone: (956) 831-8245
                     Fax: (956) 831-3181

Goods:      Approximately 2,090 metric tons (+10%) Extra Heavy Scan-
            dinavian Oats. Cargo is water damaged with some heating
            and some sour. Quality of cargo is sample grade. Moisture
            content is 12% to 16%. Test weight is 39 to 44 pounds per
            bushel. Sound oat count is 6% to 96%. Port of Loading:
            Uddevalla, Sweden.

Material can be removed/transported via barge, rail or truck.
Transportation arrangements/information may be obtained from Mr.
Craig Elkins with Port Elevator-Brownsville, L. C.

Loadout charges of $.04 per bushel will apply. If cargo is removed
by barge, stevedore charges of approximately $.02 to $.04 per bushel
will apply.

High bidder must take delivery of all material by 1700 hrs,
Wednesday, January 10, 2001. This deadline has been issued by Port
Elevator-Brownsville, L. C. and is not negotiable.

**HOUSTON OFFICE**
AIMU CORRESPONDENT
(713) 451-2711  •  FAX: (713) 451-4152
(800) 654-4303
12711 Woodforest Blvd. • Houston, TX 77015

# CAPT. I. S. DERRICK

**TAMPA OFFICE**
AIMU CORRESPONDENT
(813) 626-2203  •  FAX (813) 664-1604
9280 Bay Plaza Blvd., Suite 720B
Tampa, Florida 33619

INDEPENDENT SHIP & CARGO SURVEYORS, INC.

January 10, 2001

ACCOUNT SALE

**Sold To:**  Benhard Grain, Inc.
P.O. Box 68
Palmetto, Louisiana  71358

Attention: Mr. Hals Benhard
Fax No.: (318) 623-5532

**Material Sold:**  Two thousand ninety (2,090) metric tons water damaged, sour, extra heavy Scandinavian oats, covered under Uddevalle/Brunswick/Pascagoula/Houston and Mississippi River port, including but not above Baton Rouge. Ocean Bill of Lading No. KCSPSEATRASHOU01.

**Our File No.:**  M2-00300

**Location of material:**  Port Elevator-Brownsville, L.C.
Port of Brownsville
Brownsville, Texas

**Terms of Sale:**  Lump sum amount of $79,002.00, basis "as is, where is."

State sales tax is not included in this sale; buyer holds tax exemption No. 72-0861506

Receipt is acknowledged of $79,002.00 in form of a wire transfer deposited into the account of Hansen-Mueller Co. on January 8, 2001.

Said wire transfer has been received by Hansen-Mueller Co., contract No. 82074. Therefore, Account Sale is now being issued to Hansen-Mueller Co., 12231 Emmet Street, Omaha, Nebraska, 68164, Attention: Mr. Steve Sobota.

Michael C. Goodnight
Ship and Cargo Surveyor

MCG/mcg

M/V SEA TRADER
SURVEY REPORT NO. M2-00300
PHOTOGRAPH IDENTIFICATION SHEET

| Photo No. | Description |
|---|---|
| 1 | Vessel Identification. |
| 2 - 7 | Photographs illustrate stowage of oats in hold No.1, crew members beginning to skim sour oats off the top of stow, and the rust streaking patterns on the hatch coaming discussed in our report. |
| 8 - 20 | Detailed photographs of wet/sour oats in hold No.1. Note large column of sour oats below the ventilator opening in photo No. 11 and rust streaking under the ventilator in photo Nos. 11 and 12. Photographs 14 through 17 illustrate the water splash/spray pattern below the forward access hatch as discussed in our report. |
| 21 - 29 | Various discharge photographs. Photo Nos. 21 & 22 illustrate water damaged cargo that fell down from the port side to the starboard side. Photos 25 & 26 illustrate sour cargo on the conveyor being transported into the elevator and photo No. 29 illustrates further skimming of sour cargo by crew members. |
| 30 - 42 | Photographs illustrate additional water damaged/ sour oats further into discharge operations. |
| 43 - 47 | Photographs illustrate details of rust streaking on hatch coaming and positive reactions to silver nitrate tests. Photo Nos. 44 through 47 especially illustrate the large column of sour oats in the after port corner of the hold. |
| 48 - 58 | Photographs illustrate the rust streaking noted inside and outside of the forward access hatch and rust streaking outside the after access hatch, as well as on the mushroom ventilator. Also note the various positive reactions to silver nitrate tests in photo Nos. 52, 57 & 58. |
| 59 - 71 | Photographs illustrate various improperly replaced/repaired hatch cover sealing gaskets, heavy rust scale, and positive reactions to silver nitrate tests inboard of where the sealing gasket meets the compression bar. |

M/V SEA TRADER
PHOTOGRAPH IDENTIFICATION SHEET
PAGE 2

| Photo No. | Description |
| --- | --- |
| 72 - 77 | Photographs towards the completion of discharge operations illustrate the remainder of the wate damaged oats being discharged, as well as some of the wet/sour oats stuck to vessel structures within the hold. |
| 78 - 100 | Photographs illustrate various deck structures located on the bow and in areas adjacent to hold No. 1 undamaged by the reported Beaufort Force 12 seas experienced during the ocean voyage. |

**HOUSTON OFFICE**
AIMU CORRESPONDENT
(713) 461-2711  •  FAX: (713) 461-4152
(800) 654-4303
12711 Woodforest Blvd. • Houston, TX 77015

# CAPT. I. S. DERRICK

**TAMPA OFFICE**
AIMU CORRESPONDENT
(813) 626-2203  •  FAX (813) 684-1604
9280 Bay Plaza Blvd., Suite 720B
Tampa, Florida 33619



# SURVEY REPORT

No. M2-00300
March 16, 2001

## ORIGINAL

### M/V SEA TRADER
### HANSEN-MUELLER COMPANY SHIPMENT
### DAMAGE SURVEY AT BROWNSVILLE, TEXAS

This surveyor agrees to use his best efforts on behalf of those for whom this survey was performed, but it is expressly understood and agreed, unless mutually agreed to in writing to the contrary, that this survey report is made without liability to the surveyor or the company for any errors or omissions, whether due to negligence or otherwise, in excess of the amount charged for this survey report, and any and all persons interested in or to be affected by this survey report hereby accept this survey report on said basis.

**THIS IS TO CERTIFY** that the undersigned surveyor did, at the request of Marine Office of America Corporation, and for the account of whom it may concern, conduct survey on December 28 and 29, 2000, and January 2 and 3, 2001, and subsequent dates, at the Port Elevator-Brownsville, L.C. in Brownsville, Texas, for the purpose of examining the shipment described below while in stow on board the captioned barge, during the course of discharge operations at random intervals, and has the following to report.

SHIPMENT

Ocean Bill of Lading:    M/V SEA TRADER, Uddevalle/Brunswick/ Pascagoula/Houston and Mississippi River port, including but not above Baton Rouge. Ocean Bill of Lading No. KCSPSEATRASHOU01. Issued at Uddevalle, Sweden on or around November 23, 2001 (date illegible), "Clean on Board."

Shipper:                 Odal ak. for

Consignee:               Hansen-Mueller Company

Importer:                Hansen-Mueller Company

MOAC Claim No.:          M2006711

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 38 of 57

## DESCRIPTION OF GOODS

A total of 29,140.842 metric tons of extra heavy Scandinavian oats were loaded on board the vessel. According to the Master's Discharge Plan, a total of approximately 16,697 metric tons of oats were to be discharged in Brownsville, Texas, with each of hold Nos. 1, 3 and 5 containing approximately 5,500 metric tons.

## SOUND MARKET VALUE

A spot check of the oats market in Brownsville, Texas at the time of our survey indicated a sound market price of approximately $125.00 per metric ton. Verification letters submitted by independent grain traders and/or brokers support this figure. These letters have been attached and made part of this survey report. This figure would make the sound value of the grain discharged in Brownsville, Texas approximately $2,087,125.00, and the sound value of the oats stowed in hold No. 1 approximately $687,500.00.

## LOCAL AGENT AND STEVEDORE

The M/V SEA TRADER was represented in Brownsville, Texas, by Biehl & Co., as agents. Stevedoring operations were accomplished by Southern Stevedoring Co. Inc., on behalf of Port Elevator-Brownsville, L.C., discharging the captioned shipments between the dates of December 26, 2000 and January 3, 2001.

## SURVEY ATTENDENCE

Mr. Craig Elkins.............representative of Port Elevator-
                            Brownsville, L.C.


Surveyor Mervyn Tansley......representative of Maritime Consultants,
                            Inc., reportedly on behalf of vessel
                            owner's P & I Club interest.


Surveyor Arvel Thorning......representative of The Russell Marine
                            Group, reportedly directly on behalf of
                            cargo importer Hansen-Mueller Co.


Surveyor Michael Goodnight...representative of Capt. I. S. Derrick
                            Independent Ship and Cargo Surveyors,
                            Inc., on behalf of cargo underwriter's
                            interest.

## SURVEY

On December 28, 2000, our office was contacted by Marine Office of America to attend survey in Brownsville, Texas to investigate water damaged oats aboard the captioned vessel. The undersigned surveyor arrived at the vessel on the night of December 28, 2000 at approximately 2200 hours. Discharge operations were completing for the night, but the undersigned surveyor spoke with Mr. Craig Elkins of Port Elevator-Brownsville, L.C., as well as surveyor Mr. Arvel Thorning of The Russell Marine Group, reportedly on board the vessel directly on behalf of Hansen-Mueller Co. They explained that upon commencement of discharge of hatch No. 1 this morning, what appeared to be wet oats were discovered in the hold. At that point they discontinued discharge and contacted Marine Office of America Corporation.

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 40 of 57

Upon our inspection of cargo stowed in hold No. 1 the following morning, December 29, 2001, we did observe water damaged, sour oats in several locations within the hold. Upon initial inspection, wet/sour oats were found along the port side of the hold where the upper slope plate met the cargo. A large column of wet/sour oats was also found directly under the ventilation opening, as well as below the forward access ladder, but it could not be determined how deep into the cargo the water had penetrated.

The situation was discussed by all parties at interest and mutually agreed that initially, all water damaged oats that were accessible be skimmed off the top of the stow. This was accomplished by the ship's crew using shovels to load the sour oats into the clampshell bucket and into drum containers. This material was then initially dumped onto the deck of the vessel to keep it from being mixed with sound cargo being discharged from hold No. 5. Discharge would then resume using the clampshell bucket. It was imperative that none of the damaged oats be mixed in with sound oats. If any of the damaged oats were mixed with the sound oats, the entire lot would be contaminated. Therefore, several hours were spent skimming water damaged, sour cargo off the top of the stow where it was accessible so that discharge operations could resume.

When discharge operations did resume, sound oats stowed on the starboard side were discharged first in order to minimize the possibility of contamination. At the point where the damaged cargo on the port side began to fall down onto the sound cargo on

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 41 of 57

the starboard side, discharge was suspended in order to skim more of the damaged cargo off the top. After discussing this at length with all parties at interest, we agreed it would be an extremely time consuming effort; however, it was the best course of action to take to minimize the loss to the greatest extent by reducing the chance of contaminating the sound cargo. This method of discharge of skimming then using the clampshell bucket then skimming, etc., was utilized in hold No. 1 until completion.

Upon further investigation within hold No. 1, the undersigned surveyor observed a water-splash spray pattern on the forward bulkhead directly below the forward access ladder. Also, rust streaking patterns were observed on vessel structures directly below the ventilation opening under the forward hatch coaming. As mentioned previously, large amounts of water damaged, sour oats were found directly below these areas.

Rust/corrosion streaking patterns were also observed on both port and starboard side hatch coamings at the point where the second hatch cover panel meets the third hatch cover panel (or center athwartships seam), as well as at the after port corner of the hatch coaming. A very large column of water damaged, sour oats was observed directly below the after port corner.

Upon inspection of the forward and aft access ladder hatches and the external mushroom type ventilator located on deck forward of hatch No. 1, numerous rusted areas and rust streaking patterns were observed. Rust streaking was particularly evident

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 42 of 57

inside the forward access ladderway leading down to a large portion of the water damaged cargo. Photographs enclosed illustrate this more clearly.

The undersigned surveyor also inspected the hatch cover sealing gaskets and found numerous areas of gaskets that were missing, damaged and/or improperly replaced. Several hatch cover structures were observed with heavy rust scale. It is the opinion of the undersigned surveyor that these conditions made it impossible for the hatch covers to make a watertight, or weathertight seal during the ocean voyage.

The undersigned surveyor conducted numerous tests with a solution of silver nitrate on all of these areas described above. Positive reactions for the presence of chlorides were obtained on the rust/corrosion streaking areas, including the rust streaking inside the forward access ladderway, as well as inboard of the sealing gasket indentation and compression bar.

Due to these conditions noted on board, the Master of the M/V SEA TRADER was presented with a Damage Notification Letter on December 29, 2000 informing him of the water damage observed to the cargo stowed in hold No. 1. The Master signed said letter, which has been attached and made part of this survey report.

A representative sample of water damaged oats was obtained by the undersigned surveyor and submitted to Dixie Services, Inc. for an independent analysis in order to identify the nature of the water to which the oats were exposed. The sample was

analyzed by atomic absorption spectrophotometry, ion chromatography
and wet chemical methods. The conclusion of this analysis, as
outlined in Dixie Services, Inc.'s report No. 104884 is as follows:
"The sodium and chloride contents of the sample are high and
indicative of contact with seawater. The relatively high phosphate
result is indicative of further contact with another substance
having a high phosphate content."

It should be noted at this time that the Master of the
M/V SEA TRADER informed the undersigned surveyor that the vessel
experienced several storms during the ocean voyage. A Sea Protest
was filed by the Master, copy of which has been attached and made
part of this survey report, on December 27, 2000, when the vessel
arrived in the port of Brownsville, Texas. It should be noted that
the first U.S. port of discharge was Pascagoula, Mississippi and a
Sea Protest was reportedly not filed upon arrival in that port.

Said Sea Protest was filed with attached log book
excerpts indicating that Beaufort Force as strong as Force 12 was
experienced resulting in the vessel shipping seas on deck and hatch
covers. The undersigned surveyor conducted a thorough inspection of
deck structures located on the bow of the vessel and in areas on
deck adjacent to the No. 1 cargo compartment. This thorough
inspection indicated no visible damage to deck structures located in
these areas. The Chief Officer of the vessel also indicated to the
undersigned surveyor that no repairs were made to structures in
these areas. Photographs included with this survey report illustrate
these findings in detail.

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 44 of 57

## APPARENT CAUSE OF DAMAGE

It is the considered opinion of the undersigned surveyor that due to all of the conditions/evidence described within this survey report, that seawater entered cargo compartment No. 1 of the vessel sometime during the ocean voyage. This occurred as a direct result of improperly maintained/repaired/replaced hatch cover sealing components, hatch access ladderway openings, and the faulty operational and/or improperly/insufficiently secured/protected ventilation opening. The water damage observed to the oats stowed in hold No. 1 was a direct result of this seawater entry.

Photographs were taken at time of our survey for the sake of clarity and are enclosed, together with a detailed Photograph Identification Sheet, for the benefit of whom it may concern.

## RECOMMENDED DISPOSITION

At the completion of discharge operations, according to the Port Elevator-Brownsville L.C. internal scale(s), approximately 2,090 metric tons of water damaged, sour oats were segregated into a separate storage area within the elevator. Hansen-Mueller Co. rejected this entire lot of water damaged oats.

At that juncture, it was recommended, without prejudice and subject to policy terms and conditions, that the lot of approximately 2,090 metric tons of water damaged oats be sold for the best price obtainable for the account of whom it may concern.

Case 1:01-cv-00137 Document 9 Filed in TXSD on 11/16/2001 Page 45 of 57

This recommendation was satisfactorily carried out by Hansen-Mueller Co. authorizing this office to proceed with salvage sale. Mr. Craig Elkins of Port Elevator-Brownsville, L.C. expressed the urgent need for this material to be removed from the elevator by 1700 hours on Wednesday, January 10, 2001. Due to this time constraint, the undersigned surveyor began contacting possible salvage firms on December 29, 2000. The lot of water damaged oats was advertised in accordance with the attached copy of Invitation to Bid. It was advertised as widely as possible given the time constraint imposed by the elevator. The Invitation to Bid was sent out by our office on January 3, 2001. This was the day that discharge operations were completed and the grand total of water damaged oats was reached by scale weight within the elevator. The salvage bid was opened on Friday, January 5, 2001.

The high salvage offer was received from Benhard Grain, Inc. in the amount of $37.80 per metric ton, for 2,090 metric tons, or $79,002.00, basis "as is, where is." All parties at interest agreed that this offer was fair and reasonable as well as represented the most economical means of disposition in the interest of minimizing the loss to the greatest extent for the account of whom it may concern. Therefore, salvage sale was consummated in accordance with the attached copy of Account Sale.

Benhard Grain, Inc. worked diligently with the Port Elevator-Brownsville, L.C. in removing the water damaged oats from their facility by the required date/time. The water damaged, sour

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 46 of 57

oats were loaded into two river barges. Both river barges were loaded by 1830 hours on Tuesday, January 9, 2001.

According to independent verification by the Corpus Christi Grain Exchange, 2,280,880 pounds and 2,303,718 pounds, or 1,034.600 metric tons and 1,044.960 metric tons, respectively, were loaded into the two river barges. These totals equal 4,584,598 pounds, or 2,079.560 metric tons of water damaged oats. After the barges were completed loading, Port Elevator-Brownsville, L.C. reported that approximately ten (10) tons of water damaged oats was stuck to the side walls of the storage facility and would have to be "bin-whipped" to be removed. At that point the second barge was closed and loading was deemed complete. This ten tons of water damaged oats was eventually removed and disposed of by Port Elevator-Brownsville, L.C., and it was considered a constructive total loss with no commercial value.

It was also agreed that approximately eight (8) metric tons of water damaged cargo could not be removed from hold No. 1 due to it being stuck in or around vessel structures within the hold. This eight (8) metric ton figure also included water damaged cargo that was initially skimmed off the top of the stow in hold No. 1 and dumped on deck of the vessel.

The operational configuration of Port Elevator-Brownsville, L.C. is such that two separate cargo holds of a vessel can be discharged at one time, provided that the cargo in both holds can be mixed. This is because the cargo is transported by conveyor into one storage area. The elevator does not have the ability to

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 47 of 57

discharge and store cargo in two separate areas simultaneously. When the water damaged oats were discovered in cargo hold No. 1, it was mutually agreed by all parties that this sour cargo not be mixed with the sound oats that were stowed in hold Nos. 3 and 5. Therefore, when cargo was being discharged from hold No. 1, hold Nos. 3 and 5 would be idle.

This situation resulted in additional discharge time of approximately forty-five (45) hours by Port Elevator-Brownsville, L.C. and Southern Stevedoring Co., Inc. It also reportedly required extra fumigation of oats that would be stored adjacent to the water damaged oats within the elevator, as well as transferring/shifting oats within the storage spaces to make space available for the segregation and storage of the sour oats.

This reportedly caused a considerable amount of extra charges and/or overtime to be charged by Port Elevator-Brownsville, L.C. and Southern Stevedoring Co., Inc. Although these charges were considerable, it was mutually agreed by all parties at interest that incurring these charges resulted in minimizing the loss to the greatest extent. Had this method of discharge not been employed and these charges not incurred, the mixing of the sour oats with the sound oats would have increased the overall loss substantially.

The cargo value and salvage proceeds, as well as the extra charges incurred throughout the course of discharge operations, due to seawater damaged sour oats in hold No. 1 is outlined in detail in the recapitulation on the following page:

## RECAPITULATION

Sound Market Value for 2,090
metric tons of extra heavy
Scandinavian oats @ $125.00 per
metric ton......................$ 261,250.00

Sound Market Value for 8 metric
tons of water damaged extra
heavy Scandinavian oats remain-
ing in hold No. 1 @ $125.00 per
metric ton......................$   1,000.00

Total Sound Market Value..................$ 262,250.00


**(\*)**Ultimate total salvage sale
proceeds for 2,079.560 metric
tons of water damaged, sour,
extra heavy Scandinavian oats @
$37.80 per metric ton..........$  78,607.37

A total of 10.440 metric tons
of sour oats remained stuck to
the side walls of the storage
facility and were considered a
constructive total loss with no
commercial value...............$   NO VALUE

A total of 8.000 metric tons of
water damaged extra heavy
Scandinavian oats remained in
hold No. 1 and on deck and were
considered a constructive total
loss with no commercial value...$   NO VALUE

Total Proceeds............................$  78,607.37

**Difference...........................................$ 183,642.63**

**(\*)**The above salvage value is $78,607.37 instead of $79,002.00 due
   to the difference in weight that was bid on by Benhard Grain,
   Inc. (2,090 metric tons) and the weight received due to the sour
   oats being stuck to the walls inside the storage hopper
   (2,079.560 metric tons). Hansen-Mueller Co. ultimately issued a
   credit of $394.63 to Benhard Grain, Inc. for this difference.

Case 1:01-cv-00137  Document 9  Filed in TXSD on 11/16/2001  Page 49 of 57

### EXTRA CHARGES INCURRED DUE TO WATER DAMAGED OATS

Extra charges by Port Elevator-
Brownsville, L.C. incurred by
Hansen-Mueller Co. due to water
damaged oats...................$ 50,276.56

Extra   charges   by   Southern
Stevedoring Co., Inc. incurred
by Hansen-Mueller Co. due to
water damaged oats.............$  9,658.55

**Total Charges.............................$ 59,935.11**


        Due to the conditions surrounding the presence of the

water damaged oats as described in this survey report, the above

charges were incurred by Hansen-Mueller Co. in the interest of

minimizing the loss to the greatest extent. These charges were

considered fair and reasonable for the work performed. It is

recommended, without prejudice and subject to policy terms and

conditions, that these charges be accepted for the account of whom

it may concern.


### ADDITIONAL EXTRA CHARGES, ETC.

Lost   despatch   claimed   by
Hansen-Mueller Co. due to the
water damaged oats.............$ 6,556.67

Extra   discharge   supervision
costs from The Russell Marine
Group   incurred   by   Hansen-
Mueller Co. due to water damag-
ed oats........................$ 4,025.00

Extra sampling charges by the
Corpus Christi Grain Exchange
incurred by Hansen-Mueller Co.
due to water damaged oats.......$   342.00

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 50 of 57

The additional extra charges listed on the previous page are included in this report and submitted for underwriter's consideration, without prejudice and subject to policy terms and conditions.

This survey was made and report is issued without prejudice to the rights of whom it may concern.


_____
Michael C. Goodnight
Ship and Cargo Surveyor

MCG/ck

Attachments: Dixie Services Inc. Report No. 104884 with all copies
             Damage Notification Letter with all copies
             Copy of Sea Protest filed by Master with all copies
             Copies of verification letters of the oats market with
               all copies
             Copies of Corpus Christi Grain Exchange Weight
               Certificates with all copies
             Copy of Invitation to Bid with all copies
             Copy of Account Sale with all copies
             Photograph Identification Sheet with all copies
             Photographs with original and two copies
             (100 prints per set)

HANSEN-MUELLER

(A)

## Elevator Costs due to Wet Oats:

M/V Sea Trader  Wet Cargo Charges

Projected discharge Times as per Master's Unloading Plan provided prior to discharge (1)

| Hatch ID | Metric Tons | HourlyDischarge | Hours Required | Total Time |
|---|---|---|---|---|
| 3 & 5 | 4,000 | 250 | 16.00 | 16.00 |
| 1 & 3 | 6,000 | 250 | 24.00 | 40.00 |
| 3 & 5 | 2,474 | 250 | 9.90 | 49.90 |
| 1 & 3 | 4,223 | 250 | 16.89 | 66.79 |
| Vessel Shiftings | | | 1.25 | 68.04 |
| | 16,697 | | | 68.04 |

Estimated Total time to Complete Vessel as per Master's plan                  68.04

| Hatch ID | Metric Tons | HourlyDischarge | Hours Worked | Total Time |
|---|---|---|---|---|
| 3 & 5 | 3,700.288 | 246.686 | 15.00 | 15.00 |
| 1 & 5 | 539.829 | 231.355 | 2.33 | 17.33 |
| 3 & 5 | 1,636.497 | 245.474 | 6.67 | 24.00 |
| 3 | 1,195.411 | 140.637 | 8.50 | 32.50 |
| 1 | 528.647 | 105.729 | 5.00 | 37.50 |
| 5 | 301.315 | 200.877 | 1.50 | 39.00 |
| 1 | 972.044 | 108.005 | 9.00 | 48.00 |
| 3 & 5 | 975.319 | 243.830 | 4.00 | 52.00 |
| 1 | 3,328.569 | 81.185 | 41.00 | 93.00 |
| 3 & 5 | 3,193.129 | 187.831 | 17.00 | 110.00 |
| 3 | 226.672 | 75.557 | 3.00 | 113.00 |
| | 16,597.719 | | | 113.00 |

Actual Total time to Complete Vessel due to wet cargo                          113.00

| | | |
|---|---|---|
| Lost Time | | (44.96) |
| Elevator Hourly Rate | | $800.00 |
| Lost time Charges | | ($35,969.60) |

| | Bushels | Totals |
|---|---|---|
| Fumigation of Good Oats placed into Flat #2 | 143,341.19 | $6,450.35 |
| Transferring Good Oats from Flat #2 back into Bins | 143,341.19 | $4,300.24 |
| Transferring Fumigated Oats out to Flat #3 | 143,341.19 | $2,150.12 |
| Emptying 2 Bins to make space for Wet Oats | 93,750.00 | $1,406.25 |
| Sub-Total Other Charges | | $14,306.96 |

| | |
|---|---|
| Lost Time Charges | $35,969.60 |
| Other Charges | $14,306.96 |
| Total | $50,276.56 |

(1) Based on the actual discharge times from the M/V Federal Baffin, M/V Federal
    Rhine and the M/V Battalion Czwartikow.  Total of 66,268.207 metric tons
    discharged in 254.41 hours

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 52 of 57

# Southern Stevedoring Co., Inc.

Contracting Stevedores
(Established 1920)
11821 East Freeway Suite 310
Houston, TX 77029
Phone 713-453-3386 Fax 713-453-3459
Original Invoice
Email paul@southernstevedoring.com

Ⓑ

**Hansen-Mueller Company**
Attn: Steve Sabota
1231 Emmett Street
Omaha, Ne. 68164-4256

Customer 831

| | |
|---|---|
| Invoice No: | 10501 |
| Location: | Brownsville |
| Last Worked | 01/04/01 |
| Date Billed: | 01/09/01 |
| Page 1 of 1 | |

| Vessel: | Sea Trader | | Total |
|---|---|---|---|
| **Product:** | **Hours** | **Cost** | |
| No. 1 Hatch | 55.000 | 175.610 | $9,658.55 |

Additional discharge cost due to Damaged cargo

**Invoice Total**   **$9,658.55**

**Wire Instructions:**

| | |
|---|---|
| Please Advise: | 713-453-3386 |
| ACH: | 113000861 |
| Bank Name: | International Bank of Commerce |
| Address: | |
| | Houston, Tx. 77265 |
| ABA: | 113000861 |
| Routing No: | 113000861 |
| Account No: | 11455721 |

03/01/2001 09:52 FAX 402 421 0???

02/28/2001 16:13   713-453-???8            SOU STEV CO            PAGE 01

Stevedore Holdings Inc. DBA
Southern Stevedoring Co., Inc.
Contracting Stevedores
(Established 1920)
11821 East Freeway, Suite 310
Houston, Texas 77029
Phone 713-453-3388   Fax 713-453-3458
Email charles@southernstevedoring.com

To:      Hansen –Mueller
Attn:    Steve Sobota-Director, Oats Merchandising
From:    Southern Stevedoring Co., Inc.
         Paul Estachy-Vice President
Date:    Wednesday, February 28, 2001

Re:      Sea Trader Stevedoring-Increased Costs of discharge
         Increased costs involved with the discharge of the Sea Trader were directly a result of the
         following:

A.   The production rate was cut by more than 50 %.  The Port Elevator has the ability to take cargo from
     two (2) cranes under normal circumstances.  Rather than work with two (2) cranes in two (2) batches
     we were forced to run one (1) crane to be able to segregate the good cargo from damaged.

     Both receiving hoppers share one (1) cargo belt over which the grain is carried into the facility.
     There was no possibility to segregate good from bad cargo as was required with the damaged cargo
     in hatch 1 and still maintain the higher production level of the 2 crane scenario.

B.   Crane standby time (which also affected production rate) resulted when ships crew was required to
     enter hatch 1 to hand segregate small amounts of damage cargo from sound cargo as directed by the
     salvage company.  Crane standby time was also incurred when the elevator switched between
     damaged cargo bins to a sound cargo bins.  In order to switch bins, the receiving belt had to be
     completely empty of the particular cargo coming out of the hold at the point in time.

C.   Holiday's during the discharge period increased the total cost.  The overtime rate is double the
     standard hourly rate.  Discharging occurred during overtime periods on Saturday, December 31,
     2000 and Sunday, January 1, 2001.

D.   Additional time was lost due to shifting between the various holds on the ship.  For stability reasons,
     as cargo was discharged we coordinated with the ship's Master and Chief Mate to switch from hatch
     1 to hatch 3 and/or hatch 5 to take off sound cargo.  Failure to do so would have placed the ship
     under stress and potentially subjected her to major structural damage.  Each shift lost 2 to 2 ½ hours
     of discharge time as grab buckets were moved, elevator bins reset, and labor moved from one part of
     the vessel to another.

02/20/2001 16:32 FAX 402 491 33??     HANSEN-MUELLER

*(E)*

## HANSEN MUELLER CO.
12231 EMMET STREET, OMAHA, NEBRASKA 68164

**LAYTIME CALCULATIONS AT DISCHARGE**

| | |
|---|---|
| MV SEA TRADER | DATE: |
| C/P DATE: | 13-Nov-00 |
| OWNERS: | SARNIA CORPORATION LTD. |
| CHARTERERS: | HANSEN MUELLER COMPANY |
| COMMODITY: | SWEDISH OATS |
| PORT OF DISCHARGE: | PASCAGOULA, MS AND BROWNSVILLE, TX |
| QUANTITY LOADED: | 29,140,842 METRIC TONS |
| DEM/DES AS PER CHARTER PARTY: | $7,000   $3,500 |
| DISCHARGE RATE: | 5,000 MT WWDSHEX FRI 1700 - MON 0800 NTC EIU |

| PASCAGOULA DISCHARGE: | | BROWNSVILLE DISCHARGE: | |
|---|---|---|---|
| NOR TENDERED | 1330 HRS 14 DEC 2000 | 0830 HRS 23 DEC 2000 | |
| NOR ACCEPTED | 0800 HRS 15 DEC 2000 | 1000 HRS 26 DEC 2000 | |
| TIME TO COUNT | 0800 HRS 15 DEC 2000 | 0800 HRS 27 DEC 2000 | |
| VESSEL COMPLETED: | 0530 HRS 21 DEC 2000 | 1500 HRS 4 JAN 2001 | |

| | | | TIME | | TIME USED | | |
|---|---|---|---|---|---|---|---|
| REMARKS | DATE | DAY | FROM - TO | | DAYS | HRS | MIN |
| **PASCAGOULA DISCHARGE:** | | | | | | | |
| TIME TO COUNT | 15-Dec-00 | FRIDAY | 0800 | 1700 | 0 | 9 | 0 |
| NTC - WEEKEND | | | 1700 | 2400 | 0 | 0 | 0 |
| NTC - WEEKEND | 16-Dec-00 | SATURDAY | 0001 | 2400 | 0 | 0 | 0 |
| NTC - WEEKEND | 17-Dec-00 | SUNDAY | 0001 | 2400 | 0 | 0 | 0 |
| NTC - WEEKEND | 18-Dec-00 | MONDAY | 0001 | 0800 | 0 | 0 | 0 |
| TIME TO COUNT | | | 0800 | 1830 | 0 | 10 | 30 |
| NTC - RAIN | | | 1830 | 2400 | 0 | 0 | 0 |
| NTC - RAIN | 19-Dec-00 | TUESDAY | 0001 | 0700 | 0 | 0 | 0 |
| TIME TO COUNT | | | 0700 | 2400 | 0 | 17 | 0 |
| TIME TO COUNT | 20-Dec-00 | WEDNESDAY | 0001 | 2400 | 1 | 0 | 0 |
| TIME TO COUNT | 21-Dec-00 | THURSDAY | 0001 | 0530 | 0 | 5 | 30 |
| | | | | | 1 | 41 | 60 |
| **BROWNSVILLE DISCHARGE:** | | | | | | | |
| TIME TO COUNT | 27-Dec-00 | WEDNESDAY | 0800 | 2130 | 0 | 13 | 30 |
| Hold #1 not working 6 hrs 50 minutes - prorated | | | 1340 | 2130 | 0 | (3) | (25) |
| NTC - RAIN | | | 2130 | 2400 | 0 | 0 | 0 |
| NTC - RAIN | 28-Dec-00 | THURSDAY | 0001 | 0800 | 0 | 0 | 0 |
| TTC - PRORATED | | | 0800 | 2400 | 0 | 16 | 0 |
| Hold #1 not working 9 hrs 20 minutes - prorated | | | | | 0 | (9) | (53) |
| TIME TO COUNT | 29-Dec-00 | FRIDAY | 0800 | 1700 | 0 | 9 | 0 |
| One gang only working due to damaged grain discharge - 9 hrs 30 min prorated | | | | | 0 | (4) | (15) |
| NTC - WEEKEND | | | 1700 | 2400 | 0 | 0 | 0 |
| NTC - WEEKEND | 30-Dec-00 | SATURDAY | 0001 | 2400 | 0 | 0 | 0 |
| NTC - WEEKEND | 31-Dec-00 | SUNDAY | 0001 | 2400 | 0 | 0 | 0 |
| NTC - HOLIDAY | 1-Jan-01 | MONDAY | 0001 | 2400 | 0 | 0 | 0 |
| NTC - HOLIDAY | 2-Jan-01 | TUESDAY | 0001 | 0800 | 0 | 0 | 0 |
| TIME TO COUNT | | | 0800 | 1215 | 0 | 4 | 15 |
| NTC - RAIN | | | 1215 | 1230 | 0 | 0 | 0 |
| TIME TO COUNT | | | 1230 | 1700 | 0 | 4 | 30 |
| NTC - RAIN | | | 1700 | 2400 | 0 | 0 | 0 |
| NTC - RAIN | 3-Jan-01 | WEDNESDAY | 0001 | 0800 | 0 | 0 | 0 |
| TIME TO COUNT | | | 0800 | 2400 | 0 | 16 | 0 |
| TIME TO COUNT | 4-Jan-01 | THURSDAY | 0001 | 1500 | 0 | 15 | 0 |
| | | | | | 0 | 65 | (28) |
| TOTALS | | | | | 1 | 106 | 32 |

| | | |
|---|---|---|
| TOTAL PASCAGOULA TIME: | 2.75 | 2 days 18 hours |
| TOTAL BROWNSVILLE TIME: | 2.6889 | 2 days 16 hours 32 minutes |
| TOTAL LAYTIME ALLOWED: | 5.8282 | |
| TOTAL LAYTIME USED: | 5.4389 | |
| TOTAL LAYTIME SAVED: | 0.3893 | DAYS |
| RATE OF DESPATCH: | $3,500 | PER DAY |
| TOTAL DESPATCH | $1,362.44 | |
| TOTAL DESPATCH DUE HANSEN MUELLER CO.= | | $1,362.44 |

| | | |
|---|---|---|
| LOST DESPATCH DUE TO DAMAGED OATS: | 44.96 HRS | $6,556.67 |
| | $145.83/HOUR | ← ** |
| TOTAL AMOUNT DUE HANSEN MUELLER COMPANY | | $7,919.11 |

02/02/2001 18:02 FAX 402 491 39FX          HANSEN-MUELLER

FROM : RMG AGRI                FAX NO. : 504-392-2010        Feb. 01 2001 12:13PM  P2

 

**THE RUSSELL MARINE GROUP**
101 Woodland Highway • Belle Chasse, LA  70037
Telephone: (504) 392-3900 • Fax: (504) 392-2010

JANUARY 31, 2001

HANSEN-MUELLER CO.
12231 EMMET STREET
OMAHA, NEBRASKA  68164

ATTN: MR. STEVE SOBOTA

PROJECT:          M/V SEA TRADER
RMG FILE NUMBER:  3-400-1-047
LOCATION:         BROWNSVILLE, TEXAS
INVOICE NUMBER:   8878

THIS IS TO INVOICE FOR CHARGES INCURRED ON YOUR BEHALF TO MITIGATE DAMAGED SWEDISH OATS IN BULK THROUGH ATTENDANCE AND SUPERVISION ON 2,312.691 S/T WHICH WAS DISCHARGED FROM THE M/V SEA TRADER AT BROWNSVILLE, TEXAS ON DECEMBER 26, 2000 – JANUARY 4, 2001.

| JOB DESCRIPTION | COST | TOTAL |
|---|---|---|
| VESSEL ATTENDANCE | | |
| 45 SURVEYOR HOURS | @ $ 75.00 / HOUR | $ 3,375.00 |
| ADDITIONAL EXPENSES | | 650.00 |
| **TOTAL INVOICE** | | **$ 4,025.00** |

***Specializing in Bulk Cargo***
Supervision • Cargo Inspections • Draft Surveys • Sampling • Analysis • Freight Forwarding • Logistics • Consulting

Case 1:01-cv-00137   Document 9   Filed in TXSD on 11/16/2001   Page 56 of 57

## INVOICE
### CORPUS CHRISTI GRAIN EXCHANGE
### PO BOX 2209 (361)289-0842
### CORPUS CHRISTI, TX  784032209
### GRAIN INSPECTION, WEIGHING
### WILLIAM BOHACH CHIEF INSPECTOR AND MANAGER

12/31/2000

--------------------------------------------------------------

For the Account of HANSEN       HANSEN & MUELLER            Invoice#        261
Location BROW   BROWNSVILLE, TEXAS               For the Month of DECEMBER  2000

    Billing Address
    HANSEN & MUELLER
    12231 EMMET ST.- SUITE 1.
    OMAHA ME 671640000

| Description | | Rate | Hours | Men | Miles | Amount |
|---|---|---|---|---|---|---|
| INSPECTION OF OUTBOUND RAIL CARS | 12 | 9.00 | | | | 108.00 |
| INSPECTION OF OUTBOUND RAIL CARS | 1 | 54.00 | | | | 54.00 |
| INSPECTION OF OUTBOUND TRUCKS | 3 | 6.25 | | | | 18.75 |
| REGULAR HOURLY CHARGE FOR VESSELS | 1 | 24.00 | 4.0 | 3 | | 288.00 |
| VESSEL/BARGE GRADE | 1 | 54.00 | | | | 54.00 |

Total Invoice:    522.75

*Vessel = Seatrader*

*Portion due from damaged oats*

$200^{00} + 54^{00} = \$342^{00}$

### Payable Upon Receipt

### Original - Customer Copy

**APPROVED** *BB*

**HOUSTON OFFICE**
AIMU CORRESPONDENT
(713) 451-2711 • FAX: (713) 451-4152
(800) 654-4303
12711 Woodforest Blvd. • Houston, TX 77015

# CAPT. I. S. DERRICK

**TAMPA OFFICE**
AIMU CORRESPONDENT
(813) 626-2203 • FAX (813) 664-1604
9280 Bay Plaza Blvd., Suite 720B
Tampa, Florida 33619

INDEPENDENT SHIP & CARGO SURVEYORS INC.

Fed. Tax ID No.: 74-1738080

Marine Office of America Corporation
333 South Wabash
Chicago, Illinois  60604

Claim No. M2006711

Our Invoice No.: M2-00300

Attention: Ms. Judith Anderson

Date: March 16, 2001

===============================================================

M/V SEA TRADER
HANSEN-MUELLER COMPANY SHIPMENT
DAMAGE SURVEY AT BROWNSVILLE, TEXAS

Attending damage survey of Hansen-Mueller Company's shipment of extra
heavy Scandinavian oats aboard the M/V SEA TRADER, at the Port Elevator-
Brownsville, L.C., Brownsville, Texas, on December 28 and 29, 2000, and
January 2 and 3, 2001, and subsequent dates, taking photographs,
obtaining samples for chemical analysis, conferring with parties at
interest to the end that the loss was minimized to the greatest extent,
and rendering detailed survey report.

Surveyor's services (12/28/00 and subsequent dates)............$ 5,820.00

Expenses: Travel, etc...............$ 839.15
          Subsistence..............  120.00
          Photographs..............  170.00
          Chemical Analysis........  150.00
          L.D. Calls/Fax, etc.......  286.00          $ 1,565.15

Total..........................................................$ 7,385.15

MCG/WPB/ck

**TERMS: NET 30 DAYS**